Filed 7/6/26  L.L. v. J.L. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| L.L., | |
| Plaintiff and Appellant, | G065487 |
| v. | (Super. Ct. No. 22P000531) |
| J.L., | O P I N I O N |
| Defendant and Respondent. | |

Appeal from a judgment and order of the Superior Court of Orange County, Yolanda V. Torres, Judge. Affirmed. Request for Judicial Notice. Granted in part and denied in part.

L.L., in pro. per., for Plaintiff and Appellant.

No appearance for Defendant and Respondent.

L.L. filed this parentage action regarding her four children with J.L. Following extensive litigation, the trial court issued final custody orders and entered judgment, which, among other things, awarded the parties joint physical and legal custody of the children. The court also made other orders, including imposing sanctions against L.L. and denying L.L.'s October 2024 request for a domestic violence restraining order (DVRO). On this appeal, L.L. contends the court erred in a number of respects. We find no error and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

L.L. and J.L. were in a relationship for approximately eleven years and have four children together. In June 2022, L.L. commenced this parentage action and requested orders regarding custody, visitation, and support. Although the parties entered into an agreement regarding temporary custody, extensive litigation ensued, including multiple requests for a DVRO and motions.

In July 2023, L.L. filed a DVRO request. In December 2023 and early 2024, the trial court (Judge Stephen T. Hicklin) held a multiday trial and denied L.L.'s DVRO request. The court found L.L. "failed to establish by a preponderance of the evidence that domestic violence has occurred" and "neither party has been completely credible in their testimony." The court ordered L.L. to pay sanctions of $4,500 under Family Code section 271.[1] The court also subsequently denied L.L.'s motion for a new trial and sanctioned

_____

[1] All undesignated statutory references are to the Family Code.

2

her an additional $5,000. L.L. appealed, and this court affirmed. (*L.L. v. J.L.* (Aug. 21, 2025, G064080) [nonpub. opn.].)[2]

On December 1, 2023, L.L. filed a motion for damages and sanctions.[3] In January 2024, the trial court (Judge Yolanda V. Torres) held a hearing and denied L.L.'s motion. The court granted J.L.'s request for sanctions under section 271 and reserved decision on the amount of the sanctions until the time of trial.

On February 15, 2024, L.L. filed a motion for reconsideration regarding her December 2023 motion for damages and sanctions. In March 2024, the trial court held a hearing and denied L.L.'s motion for reconsideration. Additionally, the court granted J.L.'s request for sanctions under section 271 and reserved decision on the amount of the sanctions until the time of trial.

---

[2] L.L. requests that we take judicial notice of the clerk's transcript and reporter's transcript in her prior appeal to this court in case No. G064080, and we grant that request. (Evid. Code, § 459.) We also grant L.L.'s request to take judicial notice of the writ petitions and records in case Nos. G065642 and G065743, which include, among other things, the court's April 3, 2025 notice of motion and motion to determine whether L.L. should be deemed a vexatious litigant; the transcript of a June 6, 2025 hearing; the June 6, 2025 order striking statement of disqualification and, in the alternative, verified answer of Judge Yolanda V. Torres; and the June 6, 2025 prefiling order. We deny L.L.'s request for judicial notice of her petition for review to our Supreme Court in S291622 because it is not relevant to this appeal. (See *Moran v. Endres* (2006) 135 Cal.App.4th 952, 953, fn. 2 [denying request for judicial notice because "those documents are not relevant to our discussion or disposition of this matter"].)

[3] L.L. filed this motion in propria persona. In the trial court, L.L. appeared in propria persona for some proceedings and was represented by counsel in others.

On May 31, 2024, L.L. filed a motion styled as a "motion to quash, modify subpoena, protective order [Code of Civil Procedure section] 1987.1" (boldface and capitalization omitted). It sought to quash a subpoena for production of L.L.'s bank records or, alternatively, for redactions in the documents or entry of a protective order. The trial court held a hearing in August 2024 and denied L.L.'s motion.[4] The court also granted J.L.'s request for $3,500 in attorney fees under Code of Civil Procedure section 1987.2 and reserved the issue of a payment plan until the time of trial.

Trial occurred over multiple days in September and October 2024. Seven witnesses testified, including both L.L. and J.L. Both parties presented closing arguments on October 10, 2024, and on October 16, 2024, the trial court filed its final custody and parenting orders (final custody orders). Among other things, the final custody orders awarded the parties joint physical and legal custody of the children.

Also on October 16, 2024, L.L. filed a motion for a mistrial and the trial court heard testimony regarding the reserved sanctions issues. L.L. testified at the hearing, and the court found her testimony not credible. The court awarded $3,500 in sanctions against L.L. for her December 2023 motion for damages and sanctions and $5,000 for her February 2024 motion for reconsideration, and it established a payment schedule for those sanctions as well as the $3,500 it previously had imposed for L.L.'s motion to quash.

On October 18, 2024, L.L. filed an ex parte request for orders. It sought a stay of the final custody orders, entry of temporary orders for final decision-making authority regarding health and school decisions for one of

_____

[4] This hearing also addressed other requests for orders filed by L.L. and a motion to compel brought by J.L.

4

the children (Le.L.), an order that J.L. administer all doctor-prescribed medication when the children are in his care, and an order that J.L. and Le.L. attend family reunification therapy. At an October 22, 2024 hearing, the trial court ordered both parties to administer all prescribed medication to the children when the children are in their care.

On October 25, 2024, L.L. filed a motion to disqualify J.L.'s counsel, and on October 30, 2024, she filed a new DVRO request.

On November 15, 2024, the trial court held a hearing on L.L.'s motion for a mistrial and DVRO request. The court denied her motion for a mistrial. The court also denied J.L.'s request to dismiss L.L.'s request for a DVRO. During the course of the hearing (part of which was continued to November 18), five witnesses testified regarding the DVRO request, including both L.L. and J.L. The court denied L.L.'s DVRO request. The court found "there is no credible evidence of domestic violence or abuse committed by" J.L., and it found "the testimony of [J.L.] more credible than [L.L.'s] testimony." The court also sanctioned L.L. $4,500 for the motion for a mistrial and another $4,500 for the DVRO request under section 271.

On December 6, 2024, the trial court held a hearing regarding L.L.'s motion to disqualify J.L.'s counsel and L.L.'s October 18, 2024 request for orders. The court denied the motion to disqualify J.L.'s counsel. Regarding the request for orders, the court noted it had already ordered, as part of its October 22, 2024 order directed to both parties, J.L. to administer all doctor-prescribed medication to the children while in his care. The court denied the other requests. The court also sanctioned L.L. $5,000 for the disqualification motion and $2,500 for the request for orders under section 271.

5

On March 7, 2025, the trial court entered judgment.[5]

DISCUSSION

"""'A judgment or order of the lower court is *presumed correct*. All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown. This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error.'""" (*In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 822; see also *Jameson v. Desta* (2018) 5 Cal.5th 594, 609 ["the burden is on an appellant to demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of the judgment"].) """'A necessary corollary to this rule is that if the record is inadequate for meaningful review, the appellant defaults and the decision of the trial court should be affirmed.'"

---

[5] L.L.'s May 6, 2025 notice of appeal states she is appealing from the final judgment entered on March 7, 2025, and orders entered on March 22, 2024; April 10, 2024; August 30, 2024; October 16, 2024; November 15, 2024; November 18, 2024; December 4, 2024; December 6, 2024; and January 6, 2025. L.L.'s challenges to orders that were entered prior to the judgment and were not separately appealable are reviewable in an appeal from the judgment. (See *Rao v. Campo* (1991) 233 Cal.App.3d 1557, 1565 ["Generally speaking, under the one final judgment rule, interlocutory or interim orders are not appealable, but are only 'reviewable on appeal' from the final judgment"].) The trial court's denial of L.L.'s 2024 DVRO request in its January 6, 2025 findings and orders after hearing is also appealable. (See Code Civ. Proc., § 904.1, subd. (a)(6).)

In June 2025, L.L. filed in this court an emergency motion for a stay pending appeal with attachments, a declaration and exhibits in support of her motion for a stay, and a motion to seal those documents. In August 2025, this court denied her motion for a stay. L.L.'s motion to seal is also denied as unnecessary in that those filings in this appeal are treated as confidential.

6

[Citation.] 'Consequently, [the appellant] has the burden of providing an adequate record. [Citation.] Failure to provide an adequate record on an issue requires that the issue be resolved against [the appellant].'" (*Jameson*, at p. 609.)

"'The appellant must present an adequate argument including citations to supporting authorities and to relevant portions of the record. [Citations.]' [Citation.] Accordingly, the California Rules of Court expressly require appellate briefs to '[s]tate each point . . . and support each point by argument and, if possible, by citation of authority' and to '[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears.' (Cal. Rules of Court, rule 8.204(a)(1)(B) & (C).)" (*L.O. v. Kilrain* (2023) 96 Cal.App.5th 616, 619–620.) "'The appellate court is not required to search the record on its own seeking error.' [Citation.] Thus, '[i]f a party fails to support an argument with the necessary citations to the record, . . . the argument [will be] deemed to have been waived.'" (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246.) Additionally, "[i]t is not our place to construct theories or arguments to undermine the judgment and defeat the presumption of correctness. When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived." (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852.) "These rules apply both to parties represented by counsel and self-represented parties. [Citation.] 'A party proceeding in propria persona "is to be treated like any other party and is entitled to the same, but no greater consideration than other litigants and attorneys."'" (*L.O.*, at p. 620.)

L.L. makes numerous arguments in her appellate brief, some of which are confusing and unclear. We have addressed her arguments as best

we understand them. As discussed further below, L.L. has forfeited many of her arguments by failing to adequately cite the record on appeal and provide developed arguments. Notably, although L.L.'s appellate brief occasionally cites the reporter's transcript and refers to some orders by their names, her brief contains no citations to the clerk's transcript, which is more than 2,300 pages.

## I.

### THE FINAL CUSTODY ORDERS

L.L. argues the trial court committed many errors in the final custody orders. L.L.'s arguments are without merit.

"The standard of appellate review of custody and visitation orders is the deferential abuse of discretion test. [Citation.] The precise measure is whether the trial court could have reasonably concluded that the order in question advanced the 'best interest' of the child. We are required to uphold the ruling if it is correct on any basis, regardless of whether such basis was actually invoked." (*In re Marriage of Burgess* (1996) 13 Cal.4th 25, 32 (*Burgess*).) "Under California's statutory scheme governing child custody and visitation determinations, the overarching concern is the best interest of the child. The court and the family have 'the widest discretion to choose a parenting plan that is in the best interest of the child.'" (*Montenegro v. Diaz* (2001) 26 Cal.4th 249, 255.)

L.L. challenges the final custody orders on the ground they lack evidentiary support and because she disagrees that they are in the best interests of the children. According to L.L., the final custody orders "misapplied best-interest standards and imposed punitive conditions unsupported by evidence." (Capitalization and boldface omitted.)

As an initial matter, based on several references in the record on appeal to a statement of decision, it appears the trial court issued a statement of decision.[6] L.L., however, fails to cite or mention the statement of decision in her appellate brief, and it does not appear to be included in the record on appeal. (See *Foust v. San Jose Construction Co., Inc.* (2011) 198 Cal.App.4th 181, 187 ["'Failure to provide an adequate record on an issue requires that the issue be resolved against [appellant]'"].) Moreover, to the extent L.L. is challenging the sufficiency of the evidence, she has not fairly summarized the evidence that supports the judgment, as she is required to do. (See *Rayii v. Gatica* (2013) 218 Cal.App.4th 1402, 1408 ["An appellant who fails to cite and discuss the evidence supporting the judgment cannot demonstrate that such evidence is insufficient"].) Indeed, L.L.'s appellate brief contains no summary of the testimony supporting the final custody orders, including the testimony by J.L.

In any event, even if L.L. did not forfeit her arguments by failing to provide an adequate record on appeal and failing to fairly summarize the evidence, L.L. has not demonstrated the trial court abused its discretion in the final custody orders. There was extensive testimony over multiple days during the trial, including ample evidence that supported the final custody orders. For example, J.L. testified about his prior care for the children and expressed his desire to have custody of them. J.L. also testified to numerous

---

[6] During trial, L.L.'s counsel requested a statement of decision regarding custody and visitation. The final custody orders stated, "[t]he court's reasoning for its orders will be set forth in the Statement of Decision." Additionally, during the November 15, 2024 hearing, the trial court referenced a statement of decision that it had rendered, and the January 6, 2025 findings and order after hearing stated, "[t]he Court notes that this is a high conflict case as indicated in the Statement of Decision, filed November 8, 2024."

instances in which L.L. interfered with his ability to exercise his parenting time with the children since the case began. There was evidence the children were often absent from or late to school while in L.L.'s care.

L.L. argues the trial court "labeled the parents 'high conflict' yet paradoxically imposed five to six custody exchanges every two weeks" (boldface omitted), and contends "[f]requent transitions are destabilizing even in amicable families; in high-conflict cases, they expose children to repeated stress and parental hostility." We cannot say the court abused its discretion in setting the number of custody exchanges during the week.[7]

L.L. argues the trial court erred in purportedly denying a school change for the children and imposing a "punitive commute." (Boldface and capitalization omitted.) L.L. contends "[t]he order forced [her] to drive the children 11 miles each way to school despite the availability of a school two minutes away," and although she "testified about the extraordinary difficulty of transporting [one of the children, Li.L.], who has moderate-to-severe autism," "[t]he court nevertheless ordered that the children 'shall not be late to school'—a directive plainly aimed at [L.L.], ignoring her testimony."[8] (Boldface omitted.) According to L.L., "[t]he commute also creates serious

---

[7] Citing *Burgess, supra*, 13 Cal.4th at p. 32, L.L.'s appellate brief states, "[t]he Supreme Court has cautioned against custody orders that 'maximize conflict at the expense of stability.'" L.L.'s assertion appears to erroneously attribute the quotation "maximize conflict at the expense of stability" to *Burgess*, as that quotation does not appear in *Burgess*.

[8] In fact, the court's order that the children be taken to school on time was directed to both parents: The final custody orders stated, "[t]he parties shall ensure that the children shall attend school and arrive on time."

safety risks,"[9] and "[b]y denying the school change, the court elevated [J.L.'s] preferences above the children's best interests and imposed a punitive burden on [L.L.]." L.L. forfeited these arguments by failing to provide any supporting record citations. Moreover, as discussed, there was evidence the children were absent from or late to school a significant number of times while in L.L.'s care. Even if L.L. testified to the difficulty of transporting one of her children, she has not demonstrated the court abused its discretion by ordering that the children arrive on time to school; nor has she demonstrated the school the children were attending (or the commute to it) was unsafe.

L.L. asserts Le.L. "expressed strong resistance to visitation with [J.L.] and would have benefitted from reunification therapy," but "the court ordered conjoint counseling against [Le.L.'s] wishes."[10] (Boldface omitted.) According to L.L., ignoring Le.L.'s wishes was a violation of section 3042. Again, however, L.L. forfeited this argument by failing to provide supporting record citations. Additionally, we disagree that ordering joint physical custody of Le.L. and conjoint therapy between J.L. and Le.L., who was 10 years old at the time of trial, was an abuse of discretion or violated section 3042. Even if Le.L. expressed a resistance to visitation with J.L., section 3042 does not mandate that a court adhere to a 10-year-old child's wishes

---

[9] L.L. asserts that, during emergencies, she "could not reach school fast enough from 11 miles away" and one of her children who had an anaphylactic reaction "went untreated for hours until [L.L.] arrived."

[10] The final custody orders stated J.L. "shall attend conjoint counseling with [Le.L.] so as to repair the relationship." L.L. does not explain in her appellate brief how the reunification therapy that she believes was appropriate for Le.L. differs from the conjoint counseling the trial court ordered.

regarding visitation regardless of the circumstances.[11] It provides, among other things, "[i]f a child is of sufficient age and capacity to reason so as to form an intelligent preference as to custody or visitation, the court shall consider, and give due weight to, the wishes of the child in making an order granting or modifying custody or visitation." (§ 3042, subd. (a).)[12]

L.L. argues the trial court abused its discretion by relying on a visitation framework from Dr. Peterson's 2022 evaluation under Evidence Code section 730 but ignoring his recommendation that sole physical custody be granted to L.L. Again, L.L. has failed to address the evidence supporting the final custody orders. For instance, J.L. testified he told Peterson in 2022 that he thought it was in the children's best interest for primary custody to

---

[11] The trial court spoke with Le.L. during the trial and subsequently noted, among other things, it was "very concerned about the fact that the child appeared to be coached."

[12] L.L. also asserts the order "conflicts with Piqui's Law (SB 616), which bars coercive therapeutic programs in estrangement cases." (Boldface omitted.) L.L. forfeited this argument by failing to provide developed argument. To the extent L.L. is referring to section 3193, that section provides, "[n]othwithstanding any other law, a court shall not order family reunification treatments, programs, or services, including, but not limited to, camps, workshops, therapeutic vacations, or educational programs that, as a condition of enrollment or participation, require or result in any of the following: [¶] (1) A no-contact order. [¶] (2) An overnight, out-of-state, or multiday stay. [¶] (3) A transfer of physical or legal custody of the child. [¶] (4) The use of private youth transporters or private transportation agents engaged in the use of force, threat of force, physical obstruction, acutely distressing circumstances, or circumstances that place the safety of the child at risk. [¶] (5) The use of threats of physical force, undue coercion, verbal abuse, isolation from the child's family, community, or other sources of support, or other acutely distressing circumstances." (*Id.*, subd. (a).) L.L. provides no developed argument for how conjoint therapy between J.L. and Le.L. is prohibited by this statute.

12

be with L.L. and for them to be with J.L. during certain days, *but J.L.'s opinion has changed since then*. L.L. has not demonstrated the court abused its discretion, and particularly given her failure to designate the court's statement of decision as part of the record on appeal, she cannot assert the court erred by purportedly not explaining its reasoning for not adopting Peterson's 2022 recommendation.[13]

L.L. contends the trial court made a demeaning and inaccurate characterization of her in the final custody orders by noting she was unemployed. The final custody orders stated: "The court has reviewed the parties' income and expense declarations and notes that both parties are unemployed. The court finds that the parties shall each pay one-half of their co-parenting sessions and one-half of all therapy/counseling for the children." L.L. asserts she "has been continuously employed as the primary caregiver for [Li.L.]—a child with moderate-to-severe autism whose therapy schedule alone exceeds forty hours per week—as well as for her elderly mother, who has stage 5 dementia, and for her three other children." Additionally, L.L. claims "the trial court treated her labor as valueless," and "[b]y contrast, [J.L.'s] voluntary unemployment was excused, and the Final Order imposed no accountability for his refusal to work." We disagree that the court's

_____

[13] Citing *In re Marriage of Battenburg* (1994) 28 Cal.App.4th 1338, 1345, L.L. claims courts "must explain" a departure from an evaluator's conclusion. Given L.L.'s failure to provide the trial court's statement of decision in the record on appeal, we cannot say the court failed to explain why it did not concur with Peterson's recommendation. In any event, *Battenburg* does not so hold. Indeed, *Battenburg* makes clear "[a] trial court is not required to accept even unanimous expert opinion at face value," and "[a]s long as the decision to reject such testimony is not 'arbitrary,' the trial court may reject the conclusion of an expert." (*Ibid*.) L.L. has not shown the trial court's decision on this issue was arbitrary.

reference to L.L. being unemployed was demeaning or demonstrates bias. The court's reference in the final custody orders to both parties being unemployed was referring to whether they were being paid by an employer and was made in the context of discussing how payments for co-parenting sessions, therapy, and counseling would be made.

L.L. argues the final custody orders "expressly allocated Chinese New Year but omitted Vietnamese Tết—despite the children being equally Vietnamese and Chinese," and "[i]t also omitted Patriots Day, which [she] testified she commemorates because of her personal connection to 9/11."[14] (Boldface omitted.) According to L.L., "[b]y selectively recognizing only one aspect of the children's heritage and disregarding [L.L.'s] cultural observances, the order reflects cultural bias." We disagree that the custody schedule for holidays demonstrates bias or any improper action by the trial court. L.L. does not argue (much less demonstrate) that she specifically raised this issue with the trial court and asked the court to include in the final custody orders a schedule for a Vietnamese holiday or any other holiday that she observes.[15]

---

[14] The final custody orders included specific custody schedules for certain holidays, including that "[t]he parties shall alternate having custody of the children on the Chinese New Year from 9:00 a.m. on New Year's Day until return to school or 9:00 a.m. the following morning with [L.L.] having custody in the even-numbered years and [J.L.] having custody in the odd-numbered years."

[15] L.L. also claims there is "structural bias in the custody schedule." (Boldface and capitalization omitted.) According to L.L., "[b]y requiring 3:00 p.m. weekday pickups and therapy exchanges, the court assumed neither parent worked outside the home. For [L.L.], whose caregiving obligations already amount to a twenty-hour-a-day job, this order is both unrealistic and punitive." L.L. again includes no record citations for

L.L. raises an issue regarding the trial court's order about responding to messages. The final custody orders stated L.L. and J.L. "shall check their messages daily and respond to the other party's messages within 24 hours" and "shall respond [within] 24 hours or sooner when applicable." L.L. argues that when she "sought [J.L.'s] approval for orthodontic estimates, the court excused his non-response." L.L.'s only record citation for this argument is to two pages of the reporter's transcript from a hearing on November 18, 2024, which occurred more than a month after the court issued its final custody orders. At that hearing, the court noted J.L. "does not need to be at your beck and call to answer an e-mail with respect to giving approval within 24 hours, unless it's, maybe, an emergency; that is not the intent. The intent was to answer questions, for example, why wasn't one of the children at school? You should be answering that within 24 hours. But he doesn't necessarily have to make a decision on medical treatment within 24 hours, unless, of course, it's life-threatening."[16] L.L. asserts the court excused J.L.'s purported obstruction but "the rule was enforced strictly against" her, and "[s]uch disparate treatment reflects bias." L.L. did not provide any record citations to support her contention that the rule was enforced unequally

---

this argument, and in any event, we disagree that the custody schedule reflects bias.

[16] In its findings and order after hearing, the court stated, "[e]ach party shall respond to requests made of the other party on Our Family Wizard within 24 hours but the party is not required to agree or make a decision to the request but only to respond to the request within 24 hours unless it is a life-threatening situation."

15

against her, and in any event, we disagree that the court's order and comments show bias.[17]

L.L. also asserts J.L. has "weaponized" the final custody orders by filing enforcement motions. L.L. has forfeited this argument by failing to provide supporting record citations. Her appellate briefing does not contain a record citation to any such motions or any court orders on them.[18]

II.

EVIDENTIARY ISSUES

L.L. argues the trial court erred in excluding evidence, refusing to hear testimony, and admitting unreliable hearsay. "We review evidentiary rulings for abuse of discretion." (*Loy v. Kenney* (2022) 85 Cal.App.5th 403, 406.) Additionally, an appellant must show prejudice from the evidentiary error. (*Christ v. Schwartz* (2016) 2 Cal.App.5th 440, 447 ["it is the burden of

---

[17] L.L. argues the trial court's "reinterpretation rewrote the order, sanctioned [J.L.'s] obstruction, and left [one of the children] without orthodontic care for months—contrary to [section 3020, subdivision (a)'s] health/safety mandate and the duty to facilitate needed medical care." To the extent L.L. is attempting to argue the court erred by not ordering J.L. to agree to orthodontic care, L.L. has forfeited this argument. L.L. provided no record citations showing she sought an order requiring J.L. to approve orthodontic care; nor did she provide record citations showing the child went months without urgently needed orthodontic care because of J.L.

[18] L.L. contends the trial court ignored coercive control under the Domestic Violence Prevention Act and the structure in the final custody orders "fails to account for coercive dynamics and places [L.L.] at continuing disadvantage." L.L.'s only citation to the record for this argument is to a subsequent hearing on her DVRO request. As discussed further below, L.L. has not shown the court ignored the law and abused its discretion in denying L.L.'s DVRO request.

16

appellants to show that it is reasonably probable that they would have received a more favorable result at trial had the error not occurred"].)

L.L. contends the trial court erroneously excluded a report by child protective services (CPS). L.L. says the report was authenticated by a custodian declaration and "[e]xcluding it violated child-safety mandates under" section 3011, subdivision (a)(5). L.L. has failed to show the court abused its discretion. L.L. cites the October 10, 2024 minute order (without citation to the clerk's transcript), which states the "[c]ourt will not allow DMV or CPS records." L.L., however, does not mention that, earlier in the trial, the court explained why it was not allowing the CPS report, noting "[t]here was no subpoena where it came directly from the entity to the court." L.L. provides no developed argument demonstrating the court erred in its reasoning for excluding the CPS record. Moreover, even if it were error not to admit the CPS report, L.L. has not demonstrated any prejudice; L.L. has failed to explain what specific content she wished to use (and for what purpose) and how it is reasonably probably such content would have led to a more favorable result for L.L.[19]

L.L. asserts, "on November 15, 2024, the [trial] court sustained hearsay objections to a treating doctor's communication, cutting off testimony despite its admissibility for notice and effect on the recipient." L.L. says "[t]his deprived the court of relevant medical evidence." L.L. has failed to demonstrate an abuse of discretion. Although not specified by L.L., this evidentiary issue occurred during the hearing on L.L.'s DVRO request. L.L. provides no developed argument describing the content of the doctor's email

---

[19] L.L. says it was "a substantiated CPS report of neglect," but she does not explain who committed the neglect, what the neglect was, and what statements in the report she sought to use.

17

and explaining how it would be relevant and admissible for a non-hearsay purpose. L.L. also has not demonstrated prejudice.

L.L. contends, "on October 16, 2024, the [trial] court admitted Zillow printouts to suggest [she] owned multi-million-dollar property," which L.L. says is "classic hearsay." Again, L.L. does not specify to which order this purported error relates. The portion of the reporter's transcript cited by L.L. for this argument was from a hearing regarding the amount of sanctions to be awarded against L.L. and her ability to pay. The portion of the reporter's transcript cited by L.L. reflects a portion of her testimony in which she appears to have been shown a document and asked questions. Contrary to L.L.'s assertion, the record does not show this document was admitted into evidence. Moreover, even if this document were admitted and it was error to do so, L.L. has not shown prejudice.

L.L. also argues she "identified a witness who attended IEP meetings with [J.L.] and could rebut [J.L.'s] credibility," but "[t]he court cut her off." The only record support for this argument that L.L. cites is a page of the reporter's transcript from a hearing on March 27, 2025, which took place after judgment was entered in this case. L.L.'s notice of appeal did not indicate she was appealing from the order from the March 27, 2025 hearing. Accordingly, that order is not before us on this appeal and, even if it were, L.L. has failed to provide developed argument regarding how the trial court abused its discretion. The March 27, 2025 hearing appears to have concerned a request for order regarding some kind of settlement agreement with a school, which L.L. does not discuss in her appellate brief. Moreover, it appears L.L. succeeded at this hearing, as the minute order indicates the court granted L.L.'s request to allow her to sign the settlement agreement without J.L.'s signature.

18

L.L. argues she sought testimony from W.V., "a physician and father of autistic children who had observed Li.L." (boldface omitted), which "would have helped the court understand the daily realities of raising an autistic child," but the court purportedly committed reversible error by excluding his testimony. L.L. has forfeited this argument by failing to provide support in the record and developed argument. L.L.'s only citation to the record in support of this argument is two pages of the reporter's transcript from the March 27, 2025 hearing, which, as discussed above, took place after judgment was entered and concerned a settlement issue that is not part of this appeal.[20]

L.L. also argues the trial court erred by refusing to order an updated evaluation under Evidence Code section 730, which she asserts was recommended by the special master. The court's decision regarding whether to appoint an evaluator under Evidence Code section 730 is also reviewed for abuse of discretion. (*In re Marriage of E.U. & J.E.* (2012) 212 Cal.App.4th 1377, 1389.) The record indicates the court denied a request for an updated evaluation under Evidence Code section 730 because "[n]either party is able to pay for the evaluation." L.L. does not provide developed argument showing how it was an abuse of discretion for the court to decline to order an updated evaluation because neither party could pay for it.

---

[20] Although not cited by L.L., the record reflects L.L.'s counsel attempted to call someone named W.V. to testify during trial on September 24, 2024, but the trial court excluded him from testifying. To the extent L.L. meant to refer to this evidentiary ruling, she has failed to provide developed argument for how the court abused its discretion by excluding W.V.'s testimony. Even if W.V. could have provided some relevant testimony, L.L. does not address whether the court abused its discretion in excluding that testimony under Evidence Code section 352.

## III.

## THE DENIAL OF THE DVRO

"The Domestic Violence Prevention Act . . . (Fam. Code, § 6200 et. seq.) permits the trial court to issue a protective order 'to restrain any person for the purpose' of preventing a recurrence of domestic violence and ensuring a period of separation of the persons involved; the petitioner must present 'reasonable proof of a past act or acts of abuse.' (§ 6300.)" (*Rodriguez v. Menjivar* (2015) 243 Cal.App.4th 816, 820, fn. omitted.) "The Legislature defined 'abuse' broadly to include intentionally or recklessly causing or attempting to cause bodily injury, sexual assault, placing a person in reasonable apprehension of imminent serious bodily injury, or engaging in behavior that could be enjoined under section 6320. (§ 6203, subd. (a).) The behaviors incorporated by the reference to section 6320 include 'molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, credibly impersonating . . . , falsely personating . . . , harassing, telephoning, . . . destroying personal property, contacting, either directly or indirectly, by mail or otherwise, coming within a specified distance of, or disturbing the peace of the other party.' (§ 6320, subd. (a).)" (*Hatley v. Southard* (2023) 94 Cal.App.5th 579, 589.)

"'[D]isturbing the peace of the other party' refers to conduct that, based on the totality of the circumstances, destroys the mental or emotional calm of the other party. This conduct may be committed directly or indirectly, including through the use of a third party, and by any method or through any means including, but not limited to, telephone, online accounts, text messages, internet-connected devices, including connected devices as defined in [s]ection 22948.30 of the Business and Professions Code, or other electronic technologies. This conduct includes, but is not limited to, coercive control,

which is a pattern of behavior that in purpose or effect unreasonably interferes with a person's free will and personal liberty." (§ 6320, subd. (c).)[21]

"We may not disturb a court's ruling on a request for a DVRO absent an abuse of discretion. [Citation.] "'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.'" [Citation.] 'To the extent that we are called upon to review the trial court's factual findings, we apply a substantial evidence standard of review.'" (*In re Marriage of G.* (2017) 11 Cal.App.5th 773, 780.) "All exercises of discretion must be guided by applicable legal principles, however, which are derived from the statute under which discretion is conferred. [Citations.] If the court's decision is influenced by an erroneous understanding of applicable law or reflects an unawareness of the full scope of its discretion, the court has not properly exercised its discretion under the law. [Citation.] Therefore, a

---

[21] "Examples of coercive control include, but are not limited to, unreasonably engaging in any of the following: [¶] (1) Isolating the other party from friends, relatives, or other sources of support. [¶] (2) Depriving the other party of basic necessities. [¶] (3) Controlling, regulating, or monitoring the other party's movements, communications, daily behavior, finances, economic resources, or access to services. [¶] (4) Compelling the other party by force, threat of force, or intimidation, including threats based on actual or suspected immigration status, to engage in conduct from which the other party has a right to abstain or to abstain from conduct in which the other party has a right to engage. [¶] (5) Engaging in reproductive coercion, which consists of control over the reproductive autonomy of another through force, threat of force, or intimidation, and may include, but is not limited to, unreasonably pressuring the other party to become pregnant, deliberately interfering with contraception use or access to reproductive health information, or using coercive tactics to control, or attempt to control, pregnancy outcomes." (§ 6320, subds. (c)(1)–(5).)

discretionary order based on an application of improper criteria or incorrect legal assumptions is not an exercise of informed discretion and is subject to reversal. [Citation.]' [Citation.] 'The question of whether a trial court applied the correct legal standard to an issue in exercising its discretion is a question of law [citation] requiring de novo review [citation]."' (*Rodriguez v. Menjivar, supra*, 243 Cal.App.4th at pp. 820–821.)

Here, the trial court did not abuse its discretion in denying L.L.'s DVRO request. L.L. argues the trial court misapplied domestic violence law in that it "ignored [J.L.'s] pattern of harassing electronic communications." (Boldface and capitalization omitted.) L.L. asserts she testified J.L. sent her 134 messages on Our Family Wizard between September 26 and October 25, 2024, and "[m]any contained accusations of 'manipulation,' 'coaching,' and 'abuse by proxy.'" According to L.L., "[i]nstead of recognizing this as harassment, the court dismissed the issue." As support for this assertion, L.L. cites the court's comment at the hearing that, "[a]t this juncture, the court finds the request for dismissal—the court is not going to grant the request for dismissal; we're going to go forward." L.L. appears to be suggesting this statement shows the court dismissed the issue of whether messages could constitute abuse, but the record shows otherwise. In fact, the court's comment was denying J.L.'s request to dismiss L.L.'s DVRO request.

The record also does not support L.L.'s contention that the trial court refused to consider the messages sent by J.L. or misapplied the law. There was extensive testimony at the hearing by both L.L. and J.L. regarding the messages exchanged between them. The court noted it had considered the totality of circumstances regarding L.L.'s request, the exhibits presented by L.L., the testimony of the five witnesses, and all relevant code sections regarding domestic violence, including disturbing the peace of the other

22

party. The court also stated it had reviewed relevant messages between L.L. and J.L. on Our Family Wizard that were provided to it. The court ultimately concluded "there is no credible evidence of domestic violence or abuse committed by" J.L. It further found "the testimony of [J.L.] more credible than [L.L.'s] testimony."

L.L. contends the trial court "excluded testimony about coercive control through medical obstruction." (Boldface and capitalization omitted.) Citing one instance, L.L. contends "[w]hen [she] explained that [J.L.'s] refusal to approve medical and therapy services left her powerless—'without his approval, I'm a sitting duck'—the court sustained objections." The cited instance does not support her argument that the trial court misunderstood the law regarding coercive control. Although not explained by L.L., in the cited instance, she attempted to introduce an exhibit of pictures of one of the children's teeth, and the court sustained a foundation objection. L.L. also does not mention the court allowed L.L. to question J.L. regarding the fact he had not, as of that time, approved of L.L. getting estimates for one of their children's orthodontic work.

L.L. also argues "the court's truncation of evidence demonstrates bias and prejudice." (Boldface and capitalization omitted.) L.L. claims "[t]he court repeatedly told [her] 'Let's move on' when she attempted to document [J.L.'s] harassment or explain medical obstruction." We disagree that the record shows the court was biased or prejudiced against L.L. Although the court did occasionally sustain objections or tell L.L. to move on to the next question, the court permitted extensive testimony regarding the alleged abuse and messages. Moreover, a court has broad discretion to control the proceedings before it, including placing reasonable limits on testimony,

including cumulative or unduly lengthy testimony. L.L. has not shown any abuse of discretion.

## IV.

FAMILY CODE SECTION 271 AND CODE OF CIVIL PROCEDURE SECTION 1987.2

*A. Family Code Section 271*

L.L. challenges the trial court's awards of sanctions against her under section 271 in the sums of $3,500 for her December 2023 motion for damages and sanctions, $5,000 for her February 2024 motion for reconsideration, $4,500 for the October 2024 DVRO request, $5,000 for the October 2024 request to disqualify J.L.'s counsel, and $2,500 for the October 2024 request for orders. L.L. has not demonstrated the trial court abused its discretion in awarding any of these sanctions under section 271.

Section 271, subdivision (a), provides: "Notwithstanding any other provision of this code, the court may base an award of attorney's fees and costs on the extent to which any conduct of each party or attorney furthers or frustrates the policy of the law to promote settlement of litigation and, where possible, to reduce the cost of litigation by encouraging cooperation between the parties and attorneys. An award of attorney's fees and costs pursuant to this section is in the nature of a sanction. In making an award pursuant to this section, the court shall take into consideration all evidence concerning the parties' incomes, assets, and liabilities. The court shall not impose a sanction pursuant to this section that imposes an unreasonable financial burden on the party against whom the sanction is imposed. In order to obtain an award under this section, the party requesting an award of attorney's fees and costs is not required to demonstrate any financial need for the award." (*Ibid.*)

24

"It has been said that section 271 and its predecessor imposes a 'minimum level of professionalism and cooperation,' to effect the policy favoring settlement of family law litigation—and a reduction of the attendant costs. [Citations.] Section 271 '"authorizes sanctions to advance the policy of promoting settlement of litigation and encouraging cooperation of the litigants" and "does not require any actual injury." [Citation.] Litigants who flout that policy by engaging in conduct that increases litigation costs are subject to imposition of attorney fees and costs as a section 271 sanction.'" (*In re Marriage of Davenport* (2011) 194 Cal.App.4th 1507, 1524.) "Section 271 does not require that the sanctioned conduct be frivolous or taken solely for the purpose of delay." (*In re Marriage of Tharp* (2010) 188 Cal.App.4th 1295, 1318.)

"Sanctions under section 271 are committed to the discretion of the trial court, and will be reversed on appeal only on a showing of abuse of that discretion, that is 'only if, considering all of the evidence viewed more favorably in its support and indulging all reasonable inferences in its favor, no judge could reasonably make the order.'" (*In re Marriage of Davenport, supra*, 194 Cal.App.4th at p. 1524.)

On appeal, L.L. argues the trial court abused its discretion because her motions do not meet the standard of a frivolous filing under *In re Marriage of Flaherty* (1982) 31 Cal.3d 637 (*Flaherty*). Although the court referred to some of L.L.'s motions as frivolous, L.L. is not correct that the court was required to find her motions met the standard under *Flaherty* in order to impose sanctions under section 271. "*Flaherty* sets a different—and higher—standard for an appellate court's imposition of sanctions for a frivolous appeal. '*Flaherty* sanctions are appropriate "only when [the appeal] is prosecuted for an improper motive—to harass the respondent or delay the

25

effect of an adverse judgment—or when it indisputably has no merit—when any reasonable attorney would agree that the appeal is totally and completely without merit.”’” (*Parker v. Harbert* (2012) 212 Cal.App.4th 1172, 1179.) In contrast, section 271 “does not require the conduct ‘be frivolous or taken solely for the purpose of delay’ as is the case with sanctions imposed under *Flaherty*.” (*Parker*, at pp. 1179–1180.) To the extent L.L. is attempting to challenge whether the motions met the applicable standard under section 271, she has failed to provide developed argument with adequate citations to the record.

L.L. argues the trial court did not make a finding on her ability to pay before imposing sanctions under section 271. The court, however, held a hearing on October 16, 2024, regarding L.L.’s ability to pay and found her testimony to not be credible. Although the court’s orders awarding the sanction amounts did not expressly state L.L. had the ability to pay, we presume it found so.

L.L. contends she was denied due process because she “was not notified that custody and financial issues were bifurcated,” and “she was not given a fair opportunity to present evidence or defend herself.” L.L. has not shown any deprivation of due process. She attended and testified at the hearing on October 16, 2024, and she cites nothing in the record indicating that she was not informed in advance of the purpose of that hearing. Indeed, at the conclusion of the October 10, 2024 hearing, the court noted that, at the next scheduled hearing (i.e., the October 16 hearing), “we can discuss or hear testimony on the financial component of these sanctions.”

L.L. argues her October 2024 request for orders was partially granted and that this somehow should insulate her from a sanction award. But simply because one of L.L.’s requests was granted does not mean the

motion is entirely immune from sanctions under section 271, without regard to the other arguments raised in the motion.[22]

*B. Code of Civil Procedure Section 1987.2*

L.L. challenges the award of $3,500 in attorney fees under Code of Civil Procedure section 1987.2. Again, we conclude her arguments are unavailing.

Under Code of Civil Procedure section 1987.2, subdivision (a), "[e]xcept as specified in subdivision (c), in making an order pursuant to motion made under subdivision (c) of [s]ection 1987 or under [s]ection 1987.1, the court may in its discretion award the amount of the reasonable expenses incurred in making or opposing the motion, including reasonable attorney's fees, if the court finds the motion was made or opposed in bad faith or without substantial justification or that one or more of the requirements of the subpoena was oppressive." (*Ibid.*) As discussed above, in May 2024, L.L. filed a motion to quash a subpoena. J.L.'s counsel filed a responsive declaration to the request for order, which requested $3,500 in attorney fees under Code of Civil Procedure section 1987.2, subdivision (a). At the August 30, 2024 hearing, the court awarded $3,500 in attorney fees under Code of Civil Procedure section 1987.2.

---

[22] L.L. also appears to argue the trial court erred by purportedly denying some of her motions without addressing her arguments. For example, L.L. argues the court dismissed her December 2023 motion solely because of its length. The record does not support that assertion. Although the court noted the motion and supporting papers appeared to be longer than allowed under the rules, the court also noted it had reviewed the papers and did not state it was dismissing the motion because of its length. Moreover, L.L. cites no authority requiring the court to provide a detailed explanation of why each and every argument set forth in her motions did not succeed.

On appeal, L.L. asserts she objected to J.L.'s counsel not filing a billing declaration setting forth the hours and hourly rates for the time spent. L.L.'s citation for her objection, however, is to a hearing on October 16, 2024. That was not a timely objection. The court ordered the award of $3,500 under Code of Civil Procedure section 1987.2 at the hearing on August 30, 2024. If L.L. intended to object to the lack of a billing declaration supporting that award of sanctions, she needed to assert that specific objection before or during the August 30, 2024 hearing, not months later.

L.L. also appears to assert the trial court violated due process when it characterized the award as a punitive sanction and failed to make new findings in support of it. L.L. appears to be arguing it was erroneous for the court to refer to an award of attorney fees under Code of Civil Procedure section 1987.2 as a sanction, which it did at the October 16, 2024 hearing. Even assuming an award of attorney fees under section 1987.2 is not a sanction as that term is used in some contexts, it is clear the court's award of $3,500 was under Code of Civil Procedure section 1987.2. We conclude there was no violation of due process.

## V.

### DUE PROCESS AND ALLEGED BIAS

*A. Alleged Denial of a Meaningful Opportunity to Be Heard*

L.L. argues the trial court violated due process by denying her a meaningful opportunity to be heard. According to L.L., "[t]he reporter's transcripts reveal a consistent pattern of the trial court silencing [her] and curtailing her ability to present argument and evidence." We disagree.

"A trial court has the inherent authority and responsibility to fairly and efficiently administer the judicial proceedings before it. [Citations.] This authority includes the power to supervise proceedings for the orderly

conduct of the court's business and to guard against inept procedures and unnecessary indulgences that tend to delay the conduct of its proceedings." (*California Crane School, Inc. v. National Com. for Certification of Crane Operators* (2014) 226 Cal.App.4th 12, 22, fn. omitted.) "Unquestionably, the trial court has the power to rule on the admissibility of evidence, exclude proffered evidence that is deemed to be irrelevant, prejudicial or cumulative and expedite proceedings which, in the court's view, are dragging on too long without significantly aiding the trier of fact. If the court errs in any of these respects, its rulings may be reviewed by a higher court and, if prejudicial, the judgment will be reversed." (*In re Marriage of Carlsson* (2008) 163 Cal.App.4th 281, 291 (*Carlsson*).) "However, the court must permit a party to have his day in court. Denying a party the right to testify or offer evidence deprives him of a fair trial and constitutes reversible error." (*California Crane School, Inc.*, at pp. 22–23; see also *Carlsson*, at p. 291 ["'Denying a party the right to testify or to offer evidence is reversible per se'"].)

L.L. asserts the "trial court repeatedly silenced [her] and her counsel," and "the court denied [her] request for rebuttal during closing argument, even while allowing [J.L.'s] counsel to argue fully." At the custody trial, L.L.'s counsel and J.L.'s counsel each made a closing argument. L.L.'s counsel then asked if she could reply, which the court did not permit, stating "[t]he court has heard everything I think it needs to hear." L.L. cites no authority that requires the court, during a bench trial, to permit a rebuttal closing argument. To the contrary, a court may exercise its discretion in

29

deciding whether to permit additional argument, and there is no basis to find that it abused that discretion here.[23]

L.L. further asserts "[t]he pattern recurred throughout trial" and cites three purported instances. According to L.L.,"[t]hese interruptions silenced [her] while [J.L.'s] counsel was allowed uninterrupted presentation." We note the three instances she cites did not occur during the custody trial, and in any event, these instances do not support that the trial court denied L.L. a meaningful opportunity to be heard or otherwise violated due process.[24] Additionally, to the extent L.L. is attempting to generally assert she was denied due process because she was not permitted sufficient opportunity to present argument and testimony, she has not demonstrated a

---

[23] Relying on *Carlsson, supra*, 163 Cal.App.4th at p. 291, L.L. asserts "[t]he Court of Appeal has made clear that the opportunity to present closing argument and rebuttal is an essential component of due process." In *Carlsson*, "[a]fter displaying ill-disguised impatience with [the appellant] and his counsel and repeatedly threatening a mistrial if the proceedings were not concluded quickly enough, [the trial judge] abruptly ended the trial before [the appellant] had finished his presentation, cutting off any opportunity for rebuttal evidence (other than six questions posed to [the appellant's] expert) or argument of counsel." (*Id.* at p. 291.) The trial judge in *Carlsson* walked out of the courtroom while a witness was on the witness stand. (*Id.* at pp. 289, 293.) The facts in *Carlsson* are not remotely similar to those here. Nor did *Carlsson* hold that due process requires a party be allowed to present a rebuttal closing argument during a bench trial.

[24] The first instance cited by L.L. occurred at the August 30, 2024 hearing, at which L.L. was represented by counsel. When the trial court was making its ruling, L.L. asked the judge "may I," and the court responded, "No. You have an attorney." The second instance cited by L.L. occurred at the December 6, 2024 hearing, when the court told L.L. not to talk over the court. The third instance cited by L.L. occurred at a March 27, 2025 hearing, when the court stated, "[s]tay where you are" after noting it was going to get a witness online and was pausing the proceedings for a moment. None of these comments by the court is in any way problematic.

due process violation. As discussed, L.L. was permitted to present multiple witnesses and there was extensive testimony as to both the custody issue and L.L.'s DVRO request.

L.L. contends the trial court denied her due process by purportedly summarily denying her motion for a mistrial and refusing to consider her substantive arguments in support of that motion. During the November 15, 2024 hearing, the court addressed L.L.'s motion for a mistrial and stated it had read the documents and intended to deny the motion. The court also noted the motion is "procedurally defective; also, it does overlap with [L.L.'s] request for the motion for the 170.1. And I will note, going to the issue of the—well, again, this goes to the issue of the 170.1. And, again, I'm not going to rule on that."[25] The court then permitted L.L. to provide further argument on the motion, which she did, and the court then denied the motion.[26] We find no violation of due process. The court noted it had reviewed the documents concerning the motion, it heard argument by L.L., and it ultimately denied the motion. L.L. provides no developed argument demonstrating her mistrial motion was timely, particularly given it was filed six days after closing arguments. Moreover, L.L. has not demonstrated on appeal that any of her arguments in the mistrial motion required a mistrial; to the extent L.L.'s mistrial motion raised the same arguments she raises on

_____

[25] Based on the limited record on appeal, it appears L.L. filed a motion to disqualify Judge Torres in October 2024 that was referred to another judge and was pending at that time. L.L. does not address what happened to that motion, but we presume it was denied as the record does not indicate Judge Torres was disqualified from continuing to hear the case.

[26] L.L. claims she "was never permitted to present her points." The record before us does not bear that out. The record shows the court permitted L.L. to provide argument on the motion at the hearing.

31

this appeal, those arguments are unavailing for the reasons discussed in this opinion.[27]

*B. Alleged Bias*

L.L. argues the trial court's conduct created the appearance of bias and amounted to a violation of due process. L.L.'s arguments regarding bias are unavailing.

As an initial matter, L.L. does not apply the correct legal standard for her argument. Citing *Catchpole v. Brannon* (1995) 36 Cal.App.4th 237, 245–246, L.L. claims due process requires "the absence of circumstances that create an appearance of bias." (Boldface omitted.) The California Supreme Court, however, has explained that, "while a showing of actual bias is not required for judicial disqualification under the due process clause, neither is the mere appearance of bias sufficient. Instead, based on an objective assessment of the circumstances in the particular case, there must exist "'the probability of actual bias on the part of the judge or decisionmaker [that] is too high to be constitutionally tolerable.""" (*People v. Freeman* (2010) 47 Cal.4th 993, 996; see also *id.* at p. 1006, fn. 4 [disapproving of *Catchpole* to the extent it has language inconsistent with the analysis in *Freeman*].)

L.L. claims the trial court was hostile and demeaning toward her. L.L. cites the same three instances discussed above, as well as two additional incidents.[28] We do not find these comments indicate any appearance of bias,

---

[27] Given L.L. has not demonstrated any errors by the trial court, we also reject L.L.'s argument that cumulative error requires reversal.

[28] One additional incident occurred at the December 6, 2024 hearing when J.L.'s counsel was speaking and L.L. interrupted. The court admonished L.L., stating "Ma'am, don't speak. Let [J.L.'s counsel] finish. She did not interrupt you. You will not interrupt her." The second additional

let alone a probability of actual bias. L.L. also claims there was an unequal application of evidentiary rules, citing the purported admission of the Zillow listing and exclusion of a communication from a doctor. As discussed above, the court did not abuse its discretion in making those evidentiary rulings, and we find no indication of bias.

L.L. asserts the trial court mischaracterized evidence regarding an incident involving the towing of a vehicle driven by J.L. L.L. cites a comment by the court during the custody trial that it was "also interested in why the car was towed during [J.L.'s] visitation time in the first place; that is weighing, right now, on my mind." L.L. asserts "the car was not towed during a visitation exchange, and the children did not witness the incident. By mischaracterizing the facts in a way that blamed [L.L.], the court displayed predisposition against her." L.L.'s argument mischaracterizes the cited comment by the court, which did not specifically refer to a visitation exchange or suggest the children witnessed the incident; the court's comment simply referred to the vehicle being towed during J.L.'s visitation time. In any event, the court's comment does not display a predisposition against L.L. The court's comment came in the context of discussing the admissibility of an exhibit, after J.L. had testified the vehicle he had driven was towed while he was visiting with the children at the house.

L.L. also argues there was a pattern of punitive sanctions imposed by the trial court. As discussed above, L.L. has not shown the court

---

incident occurred at the October 16, 2024 hearing. After hearing testimony and argument, the court stated: "I think I've heard enough on all ends. So I assume that we submit; correct?" The reporter's transcript indicates J.L.'s counsel responded "[y]es" but does not reflect any comment or response by L.L.

abused its discretion in issuing the sanctions. Moreover, we conclude the sanctions do not demonstrate a probability of actual bias.[29]

In sum, L.L. has not demonstrated any bias by the trial court.

DISPOSITION

The judgment and order denying L.L.'s October 2024 request for a DVRO are affirmed. L.L.'s request for judicial notice is granted in part and denied in part. No appellate costs are awarded because respondent did not appear.

GOODING, J.

WE CONCUR:

SANCHEZ, ACTING P. J.

DELANEY, J.

---

[29] L.L. argues that on June 6, 2025, the trial court on its own motion deemed her a vexatious litigant and imposed a prefiling order under Code of Civil Procedure section 391.7. She asserts the prefiling order is void and further evidences bias by the court. L.L.'s challenge to the prefiling order is not at issue on this appeal given that her notice of appeal here was filed before June 6, 2025, and obviously did not (indeed, could not) identify that later order. L.L. has a separate appeal pending in this court regarding the vexatious litigant determination and prefiling order (case No. G065836).

34